EXHIBIT 1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Gregory S. Weston (239944)<br>The Weston Firm<br>1405 Morena Blvd., Suite 201<br>San Diego, CA 92110<br>TELEPHONE NO.: (619) 798-2006   FAX NO.: (619) 343-2789<br>ATTORNEY FOR *(Name):* Plaintiff Sabrina Silva | **FILED BY FAX**<br>ALAMEDA COUNTY<br><br>August 20, 2020<br><br>CLERK OF<br>THE SUPERIOR COURT<br>By Gina Fu, Deputy<br><br>CASE NUMBER:<br>**RG20071342** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Alameda
STREET ADDRESS: 1225 Fallon St.
MAILING ADDRESS: 1225 Fallon St.
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Oakland - Rene C. Davidson Courthouse

CASE NAME:
Silva v. Goetze's Candy Company, Inc.

| CIVIL CASE COVER SHEET<br>☑ Unlimited   ☐ Limited<br>(Amount   (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000 or less) | Complex Case Designation<br>☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br><br>JUDGE:<br>DEPT: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):* Two
5. This case ☑ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 20, 2020

Gregory S. Weston
(TYPE OR PRINT NAME)

▶ *(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

*Unified Rules of the Superior Court of California, County of Alameda*

F. ADDENDUM TO CIVIL CASE COVER SHEET

| Short Title: Silva v. Goetze's Candy Company, Inc. | Case Number: |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE**
**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[ ] Hayward Hall of Justice (447)

[ X ] Oakland, Rene C. Davidson Alameda County Courthouse (446)     [ ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G) |
| | | Is this an uninsured motorist case? [ ] yes [ ] no | | |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ X ] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [ ] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial     Is the deft. in possession |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential     of the property? |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs     [ ] Yes   [ ] No |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] | 49 | Writ of mandate |
| | | Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No | | |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [ ] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Goetze's Candy Company, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Sabrina Silva

| |
|---|
| *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |

# FILED BY FAX
ALAMEDA COUNTY

August 20, 2020

CLERK OF
THE SUPERIOR COURT
By Gina Fu, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of California, Alameda | CASE NUMBER:<br>*(Número del Caso):* RG20071342 |
|---|---|

Rene C. Davidson Courthouse
1225 Fallon St., Oakland, CA 94612

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Gregory S. Weston, The Weston Firm, 1405 Morena Blvd., Suite _____ A 92110; (619) 798-2006

| DATE: August 20, 2020 | Clerk, by *(signature)* | , Deputy |
|---|---|---|
| *(Fecha)* | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [✓] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

    under: [ ] CCP 416.10 (corporation)      [ ] CCP 416.60 (minor)
           [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
           [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
           [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

1

**THE WESTON FIRM**
GREGORY S. WESTON (239944)

2
*greg@westonfirm.com*

3
1405 Morena Blvd., Suite 201
San Diego, CA 92110

4
Telephone:    (619) 798-2006

5
Facsimile:    (619) 343-2789

6
**Counsel for Plaintiff**

7

FILED BY FAX
ALAMEDA COUNTY

August 20, 2020

CLERK OF
THE SUPERIOR COURT
By Gina Fu, Deputy

CASE NUMBER:
**RG20071342**

8

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

9

**FOR THE COUNTY OF ALAMEDA**

10

11

12

13

SABRINA SILVA,

14
                 Plaintiff,

15
      v.

16
GOETZE'S CANDY COMPANY, INC.,

17
                 Defendant.

18

Case No:

Pleading Type: Class Action

**CLASS ACTION COMPLAINT VIOLATIONS OF THE
UNFAIR COMPETITION LAW AND BREACH OF IMPLIED
WARRANTY**

**No Jury Demand**

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

I. JURISDICTION AND VENUE ...................................................................................1

II. NATURE OF THE ACTION ....................................................................................1

III. PARTIES ..................................................................................................................2

IV. NATURE OF TRANS FAT .....................................................................................2

    A. There Is a Well-Established Scientific Consensus That Trans Fat Is Extremely Harmful. ...................................................................................3

    B. The Artificial Trans Fat in Caramel Creams Caused Cardiovascular Disease. ...................5

    C. The Artificial Trans Fat in Caramel Creams Caused Type-2 Diabetes. ...............................7

    D. The Artificial Trans Fat in Caramel Creams Caused Breast, Prostate, and Colorectal Cancer. ..............................................................................7

    E. The Artificial Trans Fat in Caramel Creams Caused Alzheimer's Disease and Cognitive Decline. ..........................................................................8

    F. The Artificial Trans Fat in Caramel Creams Caused Organ Damage. ...............................9

    G. PHO Use is Unlawful in California, the United States, and European Nations. ...............10

V. PLAINTIFF'S PURCHASES OF CARAMEL CREAMS AND COW TALES ...........................11

VI. THE USE OF PHO IN CARAMEL CREAMS WAS UNFAIR ................................................11

VII. DEFENDANT'S PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW ...............................................................12

VIII. INJURY ...................................................................................................................13

IX. DELAYED DISCOVERY .........................................................................................14

X. CLASS ACTION ALLEGATIONS ..........................................................................15

XI. PRAYER FOR RELIEF ...........................................................................................18

XII. NO JURY DEMAND ...............................................................................................19

Plaintiff Sabrina Silva, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Defendant Goetze's Candy Company, Inc. ("GCC" or "Defendant"), and upon information and belief and investigation of counsel, alleges as follows:

## I.     JURISDICTION AND VENUE

1.     Jurisdiction is proper because Plaintiff is a citizen of California and because all claims are asserted under the laws of California and govern a product that is sold in California and purchased by Plaintiff in California.

2.      Venue is proper in the Superior Court for the County of Alameda because Defendant does business in and engages in the acts complained of herein in Alameda County and because Plaintiff purchased Caramel Creams in Alameda County.

## II.     NATURE OF THE ACTION

3.     GCC manufactures, distributes, and sells caramel candy products including Caramel Creams and Cow Tales (collectively "Caramel Creams"), which contained partially hydrogenated oil ("PHO").

4.     Artificial trans fat is a toxin and carcinogen for which there are many safe and commercially viable substitutes. During the class period, GCC added artificial trans fat to Caramel Creams in the form of partially hydrogenated oil ("PHO")

5.     On June 17, 2015, the FDA determined that PHO is unsafe for use in food. Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650 (June 17, 2015). Yet GCC continued to incorporate this illegal, dangerous additive into Caramel Creams, even after the FDA tentatively (in 2013), and then finally declared it unsafe for use in food, rendering products made with PHO unlawful and adulterated.

6.     Even before the FDA's Final Determination, however, PHO was an unlawful food additive under both California and United States law.

7.     Although safe, low-cost, and commercially acceptable alternatives to PHO existed throughout the class period, GCC unfairly elected *not* to use these safe alternatives in Caramel Creams candy in order to increase profit at the expense of the health of consumers.

8.      Plaintiff Sabrina Silva purchased Caramel Creams from California grocery stores during the Class Period defined herein, for her own consumption and for her family.

9.      This action is brought to remedy Defendant's unfair and unlawful conduct. On behalf of the class defined herein, Plaintiff seeks an order compelling Defendant to, *inter alia*: (1) award Plaintiff and the Class members restitution and (2) pay costs, expenses, and reasonable attorneys' fees.

### III.   PARTIES

10.     Defendant Goetze's Candy Company, Inc. is a Maryland corporation with its principal place of business in Baltimore, Maryland. GCC owns, manufactures, distributes, and sells Caramel Creams.

11.     Plaintiff Sabrina Silva is a citizen of California who purchased Caramel Creams in California for personal and household consumption.

### IV.   NATURE OF TRANS FAT

12.     Artificial trans fat is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400˚F in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[1] The resulting product is known as partially hydrogenated oil, or PHO.

13.     PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHO molecules chemically differ from the natural fat molecules in other food products.[2]

14.     Natural fat, except the trace amounts of natural trans fat from ruminant animal sources like beef, milk, and mutton, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat"); and (2) fats that have carbon double bonds. Trans fat, in contrast to cis fat, has carbon double bonds with hydrogen atoms on opposite sides of the carbon chain.

---

[1] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[2] *See* Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). *See also* Walter Willett, *The Scientific Case for Banning Trans Fats*, Scientific American, *available at* www.scientificamerican.com/article/the-scientific-case-for-banning-trans-fats/ (last visited August 13, 2020).



15.     PHO was initially a "wonder product" attractive to the processed food industry because it combined the low cost of unsaturated *cis* fat with the flexibility and long shelf life of saturated fat. Like processed *cis* fat, PHO is manufactured from low-cost legumes,[3] while saturated fat is derived from relatively expensive animal and tropical plant sources.[4]

16.     As detailed herein, PHO causes cardiovascular disease, diabetes, cancer, and Alzheimer's disease, and accelerates memory damage and cognitive decline. These risks were well known during the entire class period, and at no point during the class period was there ever a consensus that PHO was safe to use, neither in general nor as an ingredient in candy.

17.     In using PHO as a food additive prior to 2015, GCC failed to submit a food additive petition and failed to undertake a GRAS self-determination.

**A.     There Is a Well-Established Scientific Consensus That Trans Fat Is Extremely Harmful.**

18.     The National Academies of Science were charted by an act of Congress, signed by President Lincoln in 1863. Under that charter, in 1970, the National Academy of Medicine was created. In a 2005 report, under its former name of the Institute of Medicine, it concluded there was "no safe level" of PHO or artificial trans fat intake.[5] Therefore, in 2005, there was no consensus that PHO was a safe ingredient to use in food. To the contrary, the consensus was that it is unsafe.

19.     In addition, "trans fatty acids are not essential and provide no known benefit to human

---

[3] e.g., corn oil, cottonseed oil, soybean oil, peanut oil

[4] e.g., butter, cream, tallow, palm oil, coconut oil

[5] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

health."[6] Thus, while IOM provided safe maximum levels for other food elements like saturated fat, in could not and declined to provide one for trans fat when requested by the FDA, the reason being that "**any** incremental increase in trans fatty acid intake increases the risk of CHD." *Id.* (emphasis added).

20.    In 2006, Dariush Mozaffarian of Harvard Medical School wrote in the New England Journal of Medicine, "the consumption of trans fatty acids results in considerable potential harm but no apparent benefit."[7]

21.    Julie Louise Gerberding, who served eight years as the head of the United States Centers for Disease Control and Prevention, wrote in 2009:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium . . . Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[8]

22.    Dr. Mozaffarian further writes:

> Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention.[9]

23.    In 2011, Walter Willet, also a professor at Harvard Medical School, described Defendant's

---

[6] *Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease; Proposed Rule*, 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[7] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601, 1608-1609 (2006).

[8] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-138 (2009).

[9] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601 (2006).

behavior of selling food made with PHO as "a food safety issue . . . this is actually contamination."[10]

24.     The views of these experts, and many others, show that, even before the FDA formally declared PHO to be unsafe for use in food in 2015, its use was still unlawful because there was not a consensus of scientific experts that PHO was a safe food additive.

**B.     The Artificial Trans Fat in Caramel Creams Caused Cardiovascular Disease.**

25.     Trans fat raises the risk of CHD more than any other known consumed substance.[11]

26.     A 1999 estimate published in the New England Journal of Medicine found that removing PHO from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,000 premature deaths annually."[12]

27.     By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including vasodilation, coronary artery disease, and primary cardiac arrest.

28.     In a joint Dietary Guidelines Advisory Committee Report, the Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."[13]

29.     The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."[14]

30.     Even further back, in 2003, a review of literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

    [B]ased on the consistent results across a number of the most persuasive types of study

---

[10] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

[11] Mozaffarian, 354 NEW ENG. J. MED. at 1603.

[12] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999).

[13] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[14] Am. Heart Ass'n., *Trans Fats*, *available at* https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/trans-fat (last visited August 13, 2020).

designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations . . . the available evidence for an adverse relationship between trans fat intake and CHD risk is strong.[15]

31.     The FDA concluded in 2010 that "there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart Disease]." 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010). Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk of CHD." *Id.*

32.     A study published in American Heart Association's *Circulation* found that the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after controlling for a variety of medical and lifestyle risk factors.[16]

33.     Australian researchers observed that heart attack patients possess elevated amounts of trans fat in their adipose tissue (stored body fat) compared to controls. The effects of consuming trans fat are therefore shown to be long-lived because of its storage within the body in place of natural fats.[17]

34.     Cholesterol dysregulation and systemic inflammation/immune system dysregulation are the most important pathways through which PHO consumption causes morbidity and death. Another route is by promoting atherosclerosis by degrading the function of TGF-β, a protein responsible for preventing the development of atherosclerotic lesions.[18]

35.     TGF-β also functions to suppress cancerous tumors. Degradation of TGF-β function is also likely one route by which artificial trans fat consumption promotes cancers in fatty organs and the digestive system. *Id.*

---

[15] FDA, Final Rule, 68 Fed. Reg. 41433, 41445 (July 11, 2003).

[16] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 CIRCULATION 697, 697-701 (2002).

[17] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. NUTR. 874, 874-79 (2004).

[18] Chen, C.L. et al., *A mechanism by which dietary trans fats cause atherosclerosis*, J. NUTR. BIOCHEMISTRY 22(7) 649-655 (2011).

### C.   The Artificial Trans Fat in Caramel Creams Caused Type-2 Diabetes.

36.     Artificial trans fat also causes type-2 diabetes.[19]

37.     In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to misform and malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

38.     Researchers at Northwestern University's medical school found that mice show multiple markers of type-2 diabetes after eating PHO for only four weeks.[20]

39.     By the eighth week of the study, mice fed the high trans fat diet showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress even short-term exposure to artificial trans fat places on the body. *Id.*

40.     A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[21]

### D.   The Artificial Trans Fat in Caramel Creams Caused Breast, Prostate, and Colorectal Cancer.

41.     Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

42.     A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[22]

43.     In a 25-year study of 14,916 American physicians, those in the highest quintile of trans fat consumption had more than double the risk of developing prostate cancer than the doctors in the lowest

---

[19] Am. Heart Ass'n., *Trans Fats*, *available at* https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/trans-fat (last visited August 13, 2020).

[20] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

[21] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

[22] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study*. 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

quintile.[23]

44.     A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[24]

45.     A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[25]

46.     A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[26]

**E.**     **The Artificial Trans Fat in Caramel Creams Caused Alzheimer's Disease and Cognitive Decline.**

47.     Trans fat causes Alzheimer's disease and cognitive decline.

48.     In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of . . . trans-unsaturated fats."[27]

49.     The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat." *Id.*

50.     In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of . . .

---

[23] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer*. 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

[24] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[25] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 AM. J. EPIDEMIOLOGY 289, 294 (2008).

[26] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

[27] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-99 (2003).

trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[28]

51.     The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is related to cardiovascular disease risk in individuals with type 2 diabetes. Because insulin, cholesterol, and vascular disease all appear to play important roles in brain aging and cognitive impairments, dietary fat modification may be a particularly effective strategy for preventing cognitive decline, especially in individuals with diabetes." *Id.* (citations omitted).

52.     Artificial trans fat also damages the brains of those who consume it. A study conducted by UCSD School of Medicine of 1,018 men, mostly younger men, found trans fat consumption to be strongly correlated with impaired memory.[29] The authors of the study, appearing in *Circulation*, the American Heart Association's peer-reviewed journal, conclude that "Greater dTFA [dietary trans fatty acid] was significantly associated with worse word memory in adults aged 20-45 years, often critical years for career building."

53.     Performing a word memory test, each additional gram per day of trans fat consumed was associated with 0.76 fewer words correctly recalled. The authors suggest trans fat's well-established pro-oxidant effect and its damage to cell energy processes is the pathway by which trans fat consumption damages memory ability. The young men with the highest trans fat consumption scored 12 fewer recalled words on the 104-word test. *Id.*

### F.     The Artificial Trans Fat in Caramel Creams Caused Organ Damage.

54.     Artificial trans fat molecules are readily incorporated into blood and organ cells in place of natural fat molecules, which damages vital organs, including the heart, brain, and reproductive system. Further, changing the chemical composition of cells induces systemic inflammation, where the immune system fails to recognize such cells as native to the body and becomes persistently overactive, leading to further organ damage.[30]

---

[28] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

[29] Golomb, B. et al., *Trans Fat Consumption is Adversely Linked to Memory in Working-Age Adults*, CIRCULATION. 130:A15572 (2014).

[30] *See*:

**G.      PHO Use is Unlawful in California, the United States, and European Nations.**

55.      New York City banned trans fat in restaurants in 2006.

56.      A 2004 Danish law restricted all foods to fewer than 2 percent of calories from artificial trans fat, a test that the Trans Fat Tacos did not meet during the class period.

57.      Switzerland passed the same restriction in 2008.[31]

58.      A study of Denmark's 2004 trans fat ban concluded it "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[32]

59.      These laws were all motivated by the strong evidence trans fat is dangerous, showing there was not a scientific consensus during the class period that PHO was a safe food additive.

60.      On June 17, 2015, the FDA released a declaratory order which it called its Final Determination Regarding Partially Hydrogenated Oils, finding that "PHOs are not GRAS for any use in human food." 80 Fed. Reg. 34650, 34651 (June 17, 2015) ("Final Determination").

61.      The FDA's Final Determination noted that "if there are data and information that demonstrates to a reasonable certainty that no harm will result from a specific use of a PHO in food, that information could be submitted as part of a food additive petition to FDA seeking issuance of a regulation to prescribe conditions under which the additive may be safely used in food." Final Determination at 34664.

62.      On June 11, 2015 and March 7, 2017, the Grocery Manufacturers Association ("GMA") submitted such a food additive petition and then an amended petition seeking approval to use partially

Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction*, 135 J. NUTR. 562-66 (2005);

Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study*, 79 AM. J. CLIN. NUTR. 969-73 (2004);

Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, 63 EURO. J. CLIN. NUTR. S22-33 (2009);

Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure*, 80 AM. J. CLIN. NUTR. 1521-25 (2004).

[31] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

[32] Mozaffarian, 354 NEW ENG. J. MED. at 1610; *see also* Steen, Stender, *High Levels of Industrially Produced Trans Fat in Popular Fast Food*, 354 NEW ENG. J. MED. 1650, 1652 (2006).

hydrogenated oil in "approximately 60 food categories." On May 21, 2018, the FDA denied the amended GMA petition, and stated it considered the first one abandoned. In doing so, the FDA rejected the GMA's argument for a "non-linear dose response" model and noted that "the vast majority of scientific studies have been consistent in their conclusions that trans fat consumption has a progressive and linear adverse effect on blood lipids and CHD risk." Denial of Food Additive Petition, 83 Fed. Reg. 23382, 23390 (May 21, 2018).

## V.    PLAINTIFF'S PURCHASES OF CARAMEL CREAMS AND COW TALES

63.   Plaintiff Sabrina Silva regularly purchased and consumed Caramel Creams and Cow Tales throughout the Class Period. She estimates she purchased Caramel Creams about once every two months during every year of the class period.

64.   Plaintiff and her four children consumed a dangerous amount of an illegal and dangerous food additive as a direct and foreseeable result of these purchases.

## VI.    THE USE OF PHO IN CARAMEL CREAMS WAS UNFAIR

65.   GCC's use of PHO in Caramel Creams was always unnecessary. There were several safe substitutes for PHO and artificial trans fat throughout the Class Period.

66.   During the Class Period, most manufacturers of competing candy products responsibly decided to refrain from adding artificial trans fat to their products.

67.   Although commercially viable alternative formulations and substitutes for PHO were available, GCC elected not to use them in Caramel Creams in order to increase its profits at the expense of consumers' health.

68.   GCC's practices as described herein were "unfair" within the meaning of the Unfair Competition Law because its conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of the conduct to Defendant does not outweigh the gravity of the harm to class members.

69.   In particular, while GCC's use of PHO in Caramel Creams may have some utility to Defendant in that it allowed GCC to realize higher profit margins than if it used only safe ingredients, this utility is small and far outweighed by the gravity of the serious health harm GCC inflicted upon consumers.

70.     Defendant's conduct injured competing manufacturers of similar products that did not engage in its unfair, immoral behavior, especially given the limited retail shelf space.

71.     Moreover, GCC's practices violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including the FDCA, the Food Additives Amendment of 1958 and California Education Code § 49431.7.

72.     GCC's actions also violated public policy by causing the United States, California, and every other state to pay—via Medicare, Medicaid, Affordable Care Act Exchange subsidies, veterans' health programs, public employee and retiree health insurance—for treatment of trans fat-related illnesses.

73.     Further, the injury to consumers from GCC's practices was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. Rather, the burden of avoiding dangerous and unapproved food additives is not reasonably placed on the general public, who have varied levels of education and familiarity with food safety, but rather on the manufacturers of food, both as a matter of equity and as a matter of efficiency.

## VII.   DEFENDANT'S PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW

74.     GCC's practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because PHO is not Generally Recognized as Safe (GRAS). Therefore, Defendant's use of PHO rendered Caramel Creams adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C).

75.     The PHO used in Caramel Creams appears nowhere on the FDA's list of the hundreds of substances it considers GRAS.[33]

76.     PHO also fails to meet the fundamental requirement for GRAS status—that the substance is safe. In fact, the FDA has explicitly recognized that there is no safe level of artificial trans fat consumption.

77.     Under the Food Additives Amendment of 1958, which amended the FDCA, all food additives are unsafe unless they (1) fall within a specified exemption to the statute's definition of food

---

[33] *See* 21 C.F.R. §§ 181, 182, 184 and 186.

additive, or (2) their use is pursuant to FDA approval. Because the PHOs used in Caramel Creams does not meet either of these exceptions, they are, and long have been, unsafe and unlawful for use in food.

78.     GCC's use of PHO in Caramel Creams thus constituted adulteration under 21 U.S.C. § 342.

79.     On November 8, 2013, the FDA tentatively determined PHO is not GRAS.[34]

80.     On June 17, 2015, after extensive public comment, the FDA determined trans fat is not GRAS.[35]

81.     At no point during the class period was there a scientific consensus PHO was safe. Indeed, for more than two decades, the scientific consensus has been that it is unsafe.

82.     In using PHO as a food additive prior to 2015, Defendant failed to submit a food additive petition and failed to undertake a GRAS self-determination.

83.     GCC's conduct was further "unlawful" because it violated the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically,

- 21 U.S.C. § 331(a) (prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded");
- 21 U.S.C. § 331(b) (prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce");
- 21 U.S.C. § 331(c) (prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise");
- 21 U.S.C. § 348 (prohibiting the use of any food additive unless it has been deemed GRAS).

84.     GCC's conduct further violated The California Sherman Food, Drug, and Cosmetic Law Defendant's conduct also violates California's Health and Safety Code, which prohibits the manufacture, delivery, and sale of food that "contains any poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it" *Id.* at § 110545.

### VIII.     <u>INJURY</u>

85.     When purchasing Caramel Creams, Plaintiff was seeking products of particular qualities, including products that did not negatively affect blood cholesterol levels or the health of her

---

[34] 78 Fed. Reg. 67169 (November 8, 2013).

[35] 80 Fed. Reg. 34650 (June 17, 2015).

cardiovascular system, and products made with safe, lawful ingredients.

86.     Plaintiff purchased Caramel Creams believing they had the qualities she sought based on the natural assumption that food sold in stores by large companies would not have unsafe and unlawful ingredients.

87.     Instead, Caramel Creams were actually unsatisfactory to her for the reasons described herein.

88.     Plaintiff lost money as a result of GCC's conduct because she purchased products that were detrimental to her health and were unfairly offered for sale in violation of federal and California law. Had Defendant not violated the law, Plaintiff would not have been able to purchase Caramel Creams.

89.     Plaintiff suffered physical injury when she consumed Caramel Creams, because consuming artificial trans fat in *any* quantity, including the quantity she actually consumed, inflames and damages vital organs and substantially increases the risk of heart disease, diabetes, cancer, and death.

90.     Throughout the Class Period, Caramel Creams contained an unsafe amount of artificial trans fat which rendered them unfit for their ordinary use.

91.     During the Class Period, Caramel Creams were not fit for human consumption and had a value of $0.

92.     Ms. Silva was unaware that Caramel Creams were dangerous when she purchased them, and would not have purchased them had she known they contained a food additive that is unlawful because it causes heart disease, diabetes, and cancer.

93.     Plaintiff lost money as a result of Defendant's unlawful behavior. Plaintiff altered her position to her detriment and suffered loss in an amount equal to the amount she paid for Caramel Creams.

## IX.     DELAYED DISCOVERY

94.     Plaintiff did not discover that GCC's behavior was unfair and unlawful until May 2019, when she learned the true extent of the dangers of consuming trans fat and that Defendant had been selling Caramel Creams illegally for years. Until this time, she lacked the knowledge regarding the facts of her claims against GCC.

95.     Plaintiff is a reasonably diligent consumer who exercised reasonable diligence in her purchase, use, and consumption of Caramel Creams. Nevertheless, she would not have been able to discover GCC's unfair and unlawful practices and lacked the means to discover them given that, like nearly all consumers, she is not an expert on nutrition and does not typically read or have ready access to scholarly journals such as The Journal of Nutrition,[36] The European Journal of Clinical Nutrition,[37] and The New England Journal of Medicine,[38] where the scientific evidence of artificial trans fat's dangers was published.

## X.     CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this action on behalf of herself and all others similarly situated (the "Class"), excluding Defendant's officers, directors, and employees, and the Court, its officers and their families. The Class is defined as:

> All citizens of California who purchased, for household or personal use, caramel candy products containing partially hydrogenated oil manufactured or distributed by Defendant in California between January 1, 2012 and December 31, 2017 (the "Class Period"),.

97.     Questions of law and fact common to Plaintiff and the Class include:

a. Whether GCC's conduct constituted a violation of the unfair prong of California's Unfair Competition Law;
b. Whether GCC's conduct constituted a violation of the unlawful prong of California's Unfair Competition Law;
c. Whether GCC's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;
d. Whether the slight utility GCC realized as a result of its conduct outweighs the gravity of the harm the conduct caused to its victims;
e. Whether GCC's conduct violated public policy as declared by specific

---

[36] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*, 134 J. NUTR. 874, 874-79 (2004).

[37] A. Tavani et al., *Margarine intake and risk of nonfatal acute myocardial infarction in Italian women*, 51 EUR. J. CLIN. NUTR. 30–32 (1997) (estimating a 50 percent greater risk of heart attack in women with high consumption of margarine, an association "independent of body mass index, history of hypertension and hyperlipidemia").

[38] Mozaffarian, 354 NEW ENG. J. MED. at 1611 ("10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat").

constitutional, statutory, or regulatory provisions;

    f.   Whether the injury to consumers from GCC's practices is substantial;

    g.   Whether the injury to consumers from GCC's practices is outweighed by benefits to consumers or competition;

    h.   Whether Class members are entitled to restitution;

    i.   Whether Class members are entitled to an injunction and, if so, its terms; and

    j.   Whether Class members are entitled to any further relief.

98.    By purchasing Caramel Creams, all Class members were subjected to the same wrongful conduct.

99.    Plaintiff's claims are typical of the Class's claims because all Class members were subjected to the same economic harm when they purchased Caramel Creams and suffered economic injury.

100.    Plaintiff will fairly and adequately protect the interests of the Class, has no interests that are incompatible with the interests of the Class, and has retained counsel competent and experienced in class litigation.

101.    The Class is sufficiently numerous, as it includes thousands of individuals who purchased Caramel Creams in California during the Class Period.

102.    Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as one dollar for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

103.    Questions of law and fact common to the Class predominate over any questions affecting only individual members.

**<u>First Cause of Action</u>**

**<u>Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*</u>**

104.    In both causes of action, Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

**<u>Unfair Conduct</u>**

105.    The business practices and omissions of GCC as alleged herein constitute "unfair" business acts and practices in that GCC's conduct is immoral, unethical, unscrupulous, and substantially

injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to Defendant's victims.

106.     Further, GCC's practices were unfair because they violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA, California Health and Safety Code, and California Education Code.

107.     Moreover, GCC's practices were unfair because the injury to consumers from Defendant's practices was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided or should be obligated to avoid.

**Unlawful Conduct**

108.     GCC has made and distributed, in interstate commerce and in this county, products that contained unlawful food additives. Caramel Creams were placed into interstate commerce by GCC.

109.     GCC's conduct was "unlawful" because it violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, the Food Additives Amendment of 1958, which deems a food additive unsafe unless it has met two exceptions, neither of which the PHO used in Caramel Creams products has met. 21 U.S.C. §§ 348, 342.

110.     GCC's conduct violated California's Sherman Law, because Caramel Creams contained PHO, which is a "poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." Health & Safety Code § 110545.

111.     The use of artificial trans fat in Caramel Creams thus constituted violations of the FDCA and the Sherman Law and, as such, violated the "unlawful prong" of the UCL.

112.     Plaintiff suffered injury in fact and lost money or property as a result of Defendant's unlawful acts: she was denied the benefit of the bargain when she decided to purchase Caramel Creams over competing products that were less expensive and/or contained no artificial trans fat.

113.     Had Plaintiff been aware of Defendant's unlawful conduct, she would not have purchased Caramel Creams.

114.     GCC's unlawful acts allowed it to sell more units of Caramel Creams than it would have otherwise, and at a higher price, and higher margin.

115.     Plaintiff seeks an order for the disgorgement and restitution of all revenue received by Defendant from the sale of Caramel Creams and has no adequate remedy at law.

### Second Cause of Action

### Breach of Implied Warranty of Merchantability

116.   Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

117.   Defendant, through its acts and omissions set forth herein, in the sale, marketing and promotion of the Caramel Creams, made representations to Plaintiff and the Class that Caramel Creams are safe to consume.

118.   Plaintiff and the Class bought Caramel Creams manufactured, advertised, and sold by GCC, as described herein.

119.   GCC is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was in the sale to Plaintiff and other members of the Class an implied warranty that those goods were merchantable.

120.   GCC breached that implied warranty, however, in that Caramel Creams were not fit for their ordinary purpose in that they were not safe, wholesome, and legal food products.

121.   During the Class Period, Caramel Creams were not fit for human consumption and had a value of $0.

122.   As an actual and proximate result of GCC's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by GCC to be merchantable in that they were not fit for their ordinary purpose of human consumption.

123.   Plaintiff and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of Caramel Creams' purchase price.

### XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against GCC as follows:

A.   An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiff and her undersigned counsel to represent the Class, and requiring Defendant to bear the cost of class notice, not to exceed $100,000;

B.   An award of damages and restitution of $2 million;

C.    Pre-judgment, and post-judgment interest; and

D.   An award of attorney fees and costs, not to exceed $2 million.

## XII.   NO JURY DEMAND

Plaintiff does not request a trial by jury.

DATED: August 20, 2020

Respectfully Submitted,

**THE WESTON FIRM**
GREGORY S. WESTON

**Counsel for Plaintiff**